

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARGARET SKIBBE,                                     )
                                                     )
                                                     )
                      Plaintiff,                     )       Case No. 05 C 3658
                                                     )
        v.                                           )
                                                     )       Judge Virginia M. Kendall
METROPOLITAN LIFE INSURANCE                          )
COMPANY, METLIFE DISABILITY, INC.,                   )
METLIFE GROUP, INC.,                                 )
                                                     )
                      Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Margaret Skibbe ("Skibbe") worked as a "Lead Multi-Function Processor," essentially

supervising and assisting with data entry at Automatic Data Processing ("ADP"). In 1992, when

she was 41 years old, Skibbe fell and injured her back. At that time, Skibbe underwent physical

therapy and other measures in an effort to avoid surgery. Eventually, she required surgery and over

the course of two years had surgery for a herniated disk, for a dural leak that occurred during the

surgery and for the removal of scar tissue. Skibbe never returned to work after her fall. From 1992

until 2002, Skibbe received long term disability payments equal to over 66% of her salary. During

that time, the disability plan was administered by Prudential. In spite of the burden remaining on

Skibbe to show that she was continually disabled and in spite of receiving information from a private

investigator that Skibbe was traveling to Alaska by car, fishing in Alaska, and "fire dancing" and

climbing water falls in Jamaica, Prudential did not discontinue Skibbe's long term disability

payments.

After receiving long term disability payments for eleven years, in 2003, the disability plan

under which she was covered began to be administered by Metropolitan Life Insurance Company, Metlife Disability, Inc., and Metlife Group, Inc. ("MetLife" or "Defendants"). When MetLife took over the administration of the plan, it sought an updated evaluation of Skibbe's back condition in order to determine whether she was still disabled and unable to return to work. On three occasions, after receiving written notice, Skibbe failed to provide the update, and as a result, and pursuant to the terms of the plan, MetLife discontinued her benefits. Skibbe challenged the discontinuation of her disability payments and after a number of further evaluations which were presented to MctLife, doctors determined that Skibbe was capable of returning to work. Skibbe disagreed.

Skibbe brought this action against Metlife claiming that it wrongfully terminated her long-term disability ("LTD") benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*, ("ERISA"). The Defendants claim that there is ample evidence to support the discontinuation of her disability benefits because Skibbe is capable of working, even if that work must be a form of sedentary work. The parties filed cross-motions for summary judgment.

Skibbe's Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted. The Plan required Skibbe to produce proof that her disability continued uninterrupted. Skibbe's updated medical records show that she is no longer totally disabled, and in fact, is capable of returning to work in a sedentary capacity. Accordingly, MetLife's decision to terminate Skibbe's LTD benefits was correct.

## STATEMENT OF FACTS

Skibbe is a 56-year old resident of Indiana and was employed by Automatic Data Processing

2

("ADP") as a Lead Multi-Function Operator. Pl. 56.1 Rep. ¶¶ 1, 7.[1] As a Lead Multi-Function Operator, Skibbe supervised and assisted Multi-Function Operators with entering data associated with the sale of used automobiles, trucks, and vans. *Id.* at ¶ 7. According to Skibbe, her job required traveling and carrying large exhibits. Skibbe's employer indicated that her job involved sitting 80% of the day, walking and standing 20% of the day, and carrying no more than 1-5 pounds once a day. *Id.* at ¶ 12; Def.56.1(b) ¶ 12.

On January 16, 1992, Skibbe fell at work and suffered a herniated disc. Pl. 56.1 Rep. at ¶ 10. She was 41-years old and was earning $52,416 per year. *Id.* at ¶ 9; Def. Ans. 56.1 ¶ 6. Skibbe applied for LTD benefits and the Plan's claims administer, Prudential Insurance Company ("Prudential"), approved Skibbe's claim. Prudential retroactively applied Skibbe's LTD Benefits to February 21, 1992 and told Skibbe that she may be eligible for Social Security Benefits. Pl. 56.1 Rep.¶¶ 11, 12; Def. Ans. 56.1 ¶ 11.

### Prudential's Administration of the Plan and Skibbe's Treatment from February 1992 through November 2001

Beginning on May 14, 1992, Skibbe underwent a conservative course of treatment for her condition with the help of her primary physician, Dr. Irving Bush. Def. Ans. 56.1 ¶ 12. Skibbe received shots of cortisone and pain medication. *Id.* Conservative treatment was unsuccessful and

---

[1] Citations to "Plaintiff's Reply to Defendant's Statement of Facts Pursuant to Local Rule 56.1" have been abbreviated to "Pl. 56.1 Rep." Citations to "Defendant's Answer to Plaintiff's Statement of Facts Submitted Pursuant to Local Rule 56.1" have been abbreviated to "Def. Ans. 56.1." Citations to Defendant's Statement of Additional Uncontested Material Facts Submitted Pursuant to Local Rule 56.1(b)(3)(c) have been abbreviated to "Def.56.1(b)." Plaintiff did not answer Defendant's Statement of Additional Uncontested Material Facts Submitted Pursuant to Local Rule 56.1(b)(3)(c), and therefore, those facts will be deemed admitted when supported by the record. N.D. Ill. Loc., R 56.1 (2007). MetLife attached the entire administrative record to its Statement of Facts Pursuant to Local Rule 56.1 and each numbered page bears the bate-stamp "MET." As such, the Court will use the MET bate-stamp when directly citing to the administrative record.

3

Skibbe began to experience pain radiating from her back down to her legs and numbness in both of her feet. *Id.* Dr. Bush referred Skibbe to a neurosurgeon, Dr. K. Panchal, who ordered an MRI scan. *Id.* at ¶ 13. The scan revealed disc space narrowing at L5-S1 with diffuse bulging of the disc and mild foraminal compromise bilaterally for which Skibbe underwent a course of medication and physical therapy several times per week. *Id.* On April 9, 1992, a myelogram and CT scan revealed further degenerative changes and disc space narrowing and a cystoscopy and cystometrogram revealed a spastic neurogenic bladder. *Id.*; Def. Ans. 56.1 ¶ 14. Dr. Panchal observed noticeable hypertrophic changes in the facette joints. *Id.*

On July 2, 1992, Skibbe underwent a wide decompressive laminectomy at L5-S1. Def. Ans. 56.1 ¶ 15. After Skibbe's surgery, her operating surgeon, Dr. Gunnar Anderson, noted that she was "temporarily totally disabled." MET 0375. Skibbe was discharged, but was later readmitted complaining of intolerable pain. Def. Ans. 56.1 ¶ 15. She was kept on strict bed rest and treated with a muscle relaxant and Valium. *Id.* During her second admission, an MRI revealed a large dural leak prompting the need for surgical repair. *Id.* The surgery was successful, and Skibbe was discharged on August 5, 1992. *Id.*

Six months later, Skibbe's follow-up MRI revealed "a very severely degenerative disc at the L5-S1 level with almost total resorption and bony end plate changes" as well as a "significant amount of scar tissue surrounding the nerve roots." Def. Ans. 56.1 ¶ 16. Dr. Anderson fit Skibbe with a thoracolumbar orthosis to treat her pain. *Id.*

Three months later, Skibbe underwent a third surgery at Rush-Presbyterian Hospital consisting of a posterolateral fusion L5-L1 with unilateral pedicle screw instrumentation with right iliac crest bone grafting. Def. Ans. 56.1 ¶ 17. Her pre and post-operative diagnosis was

4

"degenerative disc disease and stability." *Id.* Skibbe underwent surgery to remove scar tissue on May 5, 1993 and was discharged on May 7, 1993. *Id.*; Def. Ans. 56.1 ¶ 18.

Skibbe continued to experience pain following the surgeries and pursued treatment at the Illinois Pain Treatment Clinic from June 3, 1993 to November 2, 1994. *Id.* at ¶ 19. On August 31, 1993, Dr. Anderson reevaluated Skibbe and concluded that she "has done very well since her pain has disappeared, and the fusion is healing." MET 267. Dr. Anderson expected that Skibbe would need a couple of months of therapy before returning to work. *Id.* He referred Skibbe to The Spine Center, and on December 15, 1993, Dr. David Spencer wrote Dr. Anderson regarding Skibbe's evaluation. Pl. 56.1 Rep. at ¶ 13; MET 264. Dr. Spencer opined that Skibbe's neurogenic bladder problem was preexisting and not related to her back problem. *Id.* Dr. Spencer also believed that Skibbe should resume her normal activities as much as possible and that she should "resume work including traveling." *Id.* On May 18, 1994, Skibbe underwent a second surgery to remove scar tissue. Def. Ans. 56.1 ¶ 18.

In early 1996, Prudential asked Skibbe to produce medical records supportive of her claim for continued disability. In response, Skibbe submitted Dr. Bush's Attending Physician's Statement. Def. Ans. 56.1 ¶ 21. Dr. Bush felt that Skibbe had not made significant progress, and in fact, had deteriorated. *Id.* When asked what duties Skibbe was able to perform in light of her condition, Dr. Bush wrote, "very little." *Id.* One year later, Skibbe submitted updated medical records to Prudential where Dr. Bush opined that Skibbe was unable to perform "any gainful work." *Id.* at ¶ 22.

Sometime after July 9, 1997, Prudential received a Memorandum of Investigation from Sal Del Preore, a Special Investigator with the National Anti-Fraud Division of the National Insurance

5

Crime Bureau. Pl. 56.1 Rep. ¶¶ 14, 15; MET 0002-0029. Preore's report described Skibbe's activities during a June 1993 trip to Alaska, where Skibbe was photographed holding a fish, and a 1993 Jamaican vacation at a Sandal's resort where Skibbe was videoed "fire dancing" and photographed climbing Dunns River Falls. *Id.* Preore described Jamaican fire dancing as "vigorously shaking and moving" one's body for a period of several minutes. *Id.* The report also detailed Skibbe's activities during a January 26, 1997 move from a residence located at 9 Guth Street in East Dundee, Illinois. *Id.* During the move from Guth Street, an unidentified male undertook the majority of the heavy lifting, but Skibbe was videotaped turning over what appeared to be a refrigerator. *Id.* Skibbe narrated the video of the Alaska trip, a professional photographer filmed Skibbe "fire dancing," and Skibbe's move was recorded by a hidden camera. *Id.* Preore received the videotape, request for investigation, and photographs from Susan Alexander, Skibbe's estranged husband's girlfriend. *Id.* Alexander requested money in exchange for supplying the information. *Id.*; *See also* MET 0004.

The Alaska footage was inconclusive, but Preore believed that the videotape evidence of Skibbe's fire dance and move from Guth Street "may serve to document that Alexander's allegations are credible." *Id.* Nonetheless, Preore noted that it would be difficult to prove that Skibbe does not suffer from back injuries in light of her medical records. *Id.*

On November 24, 1997, Dr. Rom Charmin evaluated Skibbe at Prudential's request and found that she could sit continuously for ten to fifteen minutes and stand or walk continuously for ten minutes in an eight-hour work day. Def. Ans. 56.1 ¶ 23. With rest, Skibbe could sit and stand for fifteen minutes. *Id.* Dr. Charmin further noted that with treatment and rehabilitation, Skibbe should be able to engage in some gainful occupation, with specific restrictions on lifting and

6

walking. *Id.*

In 1999, Skibbe supplied an unidentified physician's evaluation to Prudential in support of her claim for continued disability benefits. MET 0198. On the form, Skibbe wrote that her pain had increased and that she suffered from incontinence and urgency as a result of her neurogenic bladder. *Id.* The physician's findings are illegible. *Id.* Records concerning Skibbe's condition between 1999 and 2000 were not included in the administrative record. However, on March 1, 2001, Dr. Greg Harmston completed an Attending Physician's Statement and noted that Skibbe's condition was "stable." Def. Ans. 56.1 ¶ 25. Dr. Harmston described Skibbe's current activities as "sedentary and walking" and he expected Skibbe to improve minimally. *Id.* Dr. Harmston diagnosed Skibbe with herniated disc and neurogenic bladder and found that in order for Skibbe to return to work her back pain would need to decrease and her bladder control would need to increase. *Id.* However, Dr. Harmston made no findings with respect to Skibbe's ability to return to her own job. *Id.*

## MetLife Begins Administering the Plan

MetLife began administering Skibbe's plan on November 1, 2002. Pl. 56.1 Rep. ¶ 16; Def.56.1(b) ¶¶ 4, 14. One month later, MetLife wrote Skibbe and requested updated vocational and medical information for her file. Def. Ans. 56.1 ¶ 27. Skibbe did not respond, and MetLife reiterated its request for updated records on February 4, 2003. Pl. 56.1 Rep. ¶ 18. Two weeks later, Skibbe told MetLife that she did not receive MetLife's correspondence because she moved from Illinois to Indiana. Def. Ans. 56.1 ¶ 28. Skibbe explained that she requested medical records from her previous attending physician, but had not received them, and that her new physician would not complete MetLife's form without seeing her previous medical records. *Id.* MetLife extended its deadline for its receipt of Skibbe's records and set an absolute deadline of April 25, 2003. Pl. 56.1

7

Rep. ¶ 20. Skibbe missed the deadline, and MetLife suspended Skibbe's LTD benefits effective May 1, 2003. *Id.* at ¶ 21.

On May 9, 2003, Skibbe's attorney, Paul Stowick, wrote MetLife explaining that her new physician, Dr. Waters, would not preform an evaluation until Skibbe's blood pressure lowered and asked MetLife to contact Dr. Waters to schedule a reasonable time frame to complete the required forms. Def. Ans. 56.1 ¶ 30.

## Dr. Waters' Examinations

Dr. Scott Waters examined Skibbe on April 16, 2003 and noted that she appeared to be in good health and had "[f]ull range of motion, normal rotation, normal stability, normal strength and tone." Pl. 56.1 Rep. ¶ 23. Dr. Waters noted some bilateral lower paraspinal tenderness and refilled her Vicodin prescription "with some reluctance" after Skibbe reassured him that she would only use her "usual amount." *Id.* On April 25, 2003, Dr. Waters treated Skibbe for hypertension and noted that she appeared to be in good health, but refused to complete a functional capacity evaluation due to Skibbe's high blood pressure. *Id.* at ¶ 24.

Skibbe returned one month later complaining of feelings of depression and anxiety for which Dr. Waters prescribed Zoloft. MET 0510-11. Skibbe told Dr. Waters that she was using "very few Vicodin." *Id.* Dr. Waters diagnosed Skibbe with an "unspecified" back disorder but believed that her condition was "stable." *Id.* Upon examination, Skibbe had full range of motion, normal rotation, normal stability, strength and tone. *Id.* at ¶¶ 11, 25. Dr. Waters noted no "frequency, urgency, incontinence, hematuria or dysuria" and no "excessive thirst, hunger or urination." Def.56.1(b) ¶ 10. He refilled Skibbe's prescription for Vicodin and recommended to Skibbe that she consider returning to work. *Id.* at ¶¶ 11, 25.

8

By June 18, 2003, Skibbe's blood pressure had stabilized and Dr. Waters agreed to complete an Attending Physician's Statement. Def. Ans. 56.1 ¶ 33. In the statement, Dr. Waters' "primary diagnosis affecting [Skibbe's] work ability" was chronic pain and his secondary diagnosis was neurogenic bladder. MET 0506. Dr. Waters listed depression and hypertension as "other known injuries or present active diseases that may affect work abilities." *Id.* Based upon his examination, Skibbe was to completely avoid assuming cramped/unusual positions, climbing, and operating trucks or other small vehicles. *Id.* Dr. Waters found "some limitation" in Skibbe's ability to stand, sit, change position, reach, push/pull/twist, graph/handle, finger dexterity, repetitive movement, and bend/stoop/squat. *Id.* He found "no limitation" on activities such as transportation, balancing, operating heavy equipment, electrical equipment, or concentrated visual attention and merely "some limitation" on standing, siting, bending/stooping/squatting and a variety of other activities. *Id.*

Skibbe's feelings of depression had improved and she denied excessive crying, feelings of persistent sadness, hopelessness, and fatigue. MET 0489. Although she was not feeling back to her "regular self," she was feeling "much better." *Id.* Skibbe's hypertension was "essentially benign" and Skibbe denied chest pain, shortness of breath, dyspnea on exertion, pedal edema or headaches. *Id.* Although Dr. Waters believed that Skibbe had made "minimal progress" since her operation, he concluded that Skibbe was not "totally disabled" from "any occupation." Pl. 56.1 Rep. ¶ 27. He could not determine whether she was disabled for her "own occupation." *Id.*

Dr. Waters referred Skibbe to HealthSouth Sports Medicine and Rehabilitation Center ("HealthSouth") and HealthSouth performed a Functional Capacities Evaluation ("FCE")[2] on August

---

[2] A FCE is an evaluation conducted by an independent physician evaluator, and is a battery of physical tests that assess whether an injured employee is able to return to work and in what capacity. *Goetzke v. Ferro Corp.*, 280 F.3d 766, 770 (7th Cir. 2002).

9

17, 2003. Pl. 56.1 Rep. ¶ 28; MET 0491-503. Skibbe told the examining physical therapist, Beth Lundblad, that she believed that she could sit for 30 minutes, stand for 15 minutes, walk for 20 minutes, drive for 20 minutes, and lift 10 pounds. MET 0493. HealthSouth performed a battery of objective tests. MET 0506. Skibbe was unable to complete all lift testing, squat, crouch, bend or reach to the floor level as a result of increased lower thoracic and lumbar pain and increased right leg pain. Def. Ans. 56.1 ¶ 35. However, Skibbe was able to sit for 40 minutes frequently, which is defined as 34 to 66% of an 8-hour day or 2.5 to 5.5 hours. MET 0491-503. She was able to stand 20 minutes frequently and walk 3 minutes occasionally. *Id.* After a 2 1/4 hour examination, the Ms. Lundblad concluded that Skibbe "displayed the ability to function in the sedentary physical demand level for an 8-hour day" as defined by the U.S. Department of Labor. MET 0491. Specifically, Ms. Lundblad found that Skibbe was capable of "exerting up to 10 lbs. force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects, including [the] human body." *Id.* In Ms. Lundblad's opinion, Skibbe's physical demand level was limited to a sedentary level because of Skibbe's self limiting behavior. *Id.* Dr. Waters adopted HealthSouth's findings and attached them to his report. MET 0506-07. Skibbe produced Dr. Waters' and HealthSouth's records to MetLife in support of her claim for continued disability benefits.

Dr. G. David Bojrab at Pain Management Associates evaluated Skibbe on January 16, 2004. Def. Ans. 56.1 ¶ 39. Dr. Bojrab noted Skibbe's past history of lumbar spinal fusion with instrumentation. *Id.* Skibbe received caudal epidural steroid injections with fluoroscopy from January to March 2004 for pain management. Def. Ans. 56.1 ¶ 39. Dr. Bojrab noted that Skibbe "received good relief from her first injection." *Id.* Dr. Bojrab did not opine whether Skibbe was disabled or whether she could return to work. Def. 56.1(b) ¶ 5.

## MetLife Terminates Skibbe's LTD Benefits

Skibbe appealed MetLife's decision to suspend her benefits due to her failure to submit updated medical information describing her present condition. Def. Ans. 56.1 ¶ 32. On appeal, Skibbe contended that several physicians found that her Failed Back Surgery Syndrome was permanent and would get worse. Def. Ans. 56.1 ¶ 36. MetLife denied Skibbe's appeal finding that "the restrictions and limitations provided by Dr. Waters would not preclude [Skibbe] from performing any of the duties described in [her] job description as Lead Multi-Function Operator." *Id.* at ¶ 37.

Skibbe filed a second appeal on May 20, 2004. Pl. 56.1 Rep. ¶ 32. She argued that Dr. Waters' report was consistent with total disability, and that no opinions had been offered identifying any occupation that Skibbe was capable of performing. Def. Ans. 56.1 ¶ 38.

## Independent Physician Examinations

In August 2004, MetLife referred Skibbe's file to an independent physician, Dr. Robert Porter, who is board-certified in occupational medicine. *Id.* at ¶ 34. After reviewing Skibbe's MRI, Dr. Porter concluded that "[t]here is no indication that recent MRI scans have demonstrated pathology in her back that would be associated with significant syptomalogy nor associated with neuromuscular impairments." Def. 56.1(b) ¶ 8. Dr. Porter noted:

"Taking all the information together, does not support ongoing pathology or physical finds that would remove the ability of Ms. Skibbe from performing work duties on a full-time basis. The functional capacity examination has demonstrated her ability to perform at least at a sedentary work level. The examinations of her treating physicians and during the functional capacity evaluation support the absence of neuromuscular impairments."

*Id.* at 25. After reviewing Skibbe's medical records including those of Dr. Waters and Ms. Lundblad, Dr. Porter agreed that Skibbe was no longer totally disabled and could perform sedentary

11

work on a full-time basis. *Id.* He further opined that "[w]ith reconditioning over six weeks, [Skibbe] would have the ability to perform at a medium work level." *Id.* at ¶ 34. Dr. Porter did not personally examine Skibbe. Pl. 56.1 Rep. ¶ 33.

MetLife also forwarded Skibbe's file to Dr. Leonard Kessler, an independent physician who is board-certified in psychiatry. Pl. 56.1 Rep. ¶ 38. Dr. Kessler found that Skibbe's records were inadequate to substantiate the presence of a psychiatric disorder, as consistent with DSM IV criteria.

*Id.* Dr. Kessler noted:

> Although the claimant was prescribed Zoloft in 2003 there has been no psychiatric history provided, objective mental status findings, valid DSM IV diagnosis, treatment plan, evidence of appropriate treatment, resultant functional limitations, or allegations of psychiatric disability....There is an absence of documentation showing the presence of marked and sustained functional limitations, from a psychiatric disorder, from 5/1/03 to the present."

*Id.* Dr. Kessler did not personally examine Skibbe. *Id.* On August 10, 2004, MetLife denied Skibbe's second appeal. Pl. 56.1 Rep. ¶ 40.

Skibbe applied to the Social Security Administration ("SSA") for Social Security benefits on October 30, 1992. MET 0015. Skibbe's application was approved in 1994 when the SSA issued a finding that Skibbe suffered from "failed back surgical syndrome" and that her condition rendered her disabled as per Listing 1.05C in the Appendix to Subpart P of Regulation No. 4. Pl. 56.1 Rep. at ¶ 20; MET 0015. Skibbe continues to receive Social Security disability benefits. Pl. 56.1 Rep. at ¶ 20.

## The Plan

Skibbe is covered under the ADP Plan. Pl. 56.1 Rep. ¶ 42. The Plan is an employee welfare benefit plan sponsored by ADP and governed by ERISA. *Id.* at ¶ 2. ADP is identified as the Company and the Plan Administrator. *Id.* at ¶ 3; MET 0403. Prudential acted as the claim

12

administrator until November 1, 2002 when MetLife assumed Prudential's duties. *Id.* at ¶ 3. From

that date forward, MetLife served as the "de facto" plan administrator and the claim administrator.

*Id.*

Under the Plan, LTD benefits are paid to all Eligible Employees at a monthly rate of 66 2/3%

of the employee's basic monthly earnings; and benefits are payable until the occurrence of any of

the following dates:

- a) the date the Eligible Employee ceases to be Disabled; or
- b) the date of the Eligible Employee's death; or
- c) the date the Eligible Employee fails to submit to any required medical examination or to provide any required proof of the continuation of such Disability; or
- d) the date of the Eligible Employee refuses any rehabilitation or Partial Disability employment with the Company; or
- e) the date of any period of Disability which the Eligible Employee is not under direct care and treatment of a licensed physician.

Def. Ans. 56.1 ¶ 9. Under the plan, Total Disability means:

[T]he Person's complete inability, due to accidental bodily injury or Sickness or both,

a) during the Qualifying Period and first twenty-four (24) months of such Disability, to perform any and every duty pertaining to his/her own occupation; and

b) during an continuance of such Disability following the first twenty-four (24) months of Disability, to engage in any work or occupation for which s/he is reasonably fitted by education, training or experience.

Pl. Rep. 56.1 ¶ 43. Further written proof that Partial or Total Disability exists and has continued

uninterruptedly "must be furnished to the Company" when and so often as it may reasonably

require...during the pendency of the claim." Def.56.1(b) ¶ 3. "The Company shall have

discretionary authority to construe the terms of the Plan and to determine the benefit entitlement of

any Eligible Employee." Pl. Rep. 56.1 ¶ 45. According to the Plan, ADP "may employ any person,

persons or entity to furnish administrative services to the Plan and assist in the administration of the

13

Plan." Def.56.1(b) ¶ 2.

## STANDARD OF REVIEW

### I.     The Standard of Review for Cross-Motions for Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence

and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v.

Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment

to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement."

*Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a

proposed statement of fact is supported by the record and not adequately rebutted, the court will

accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a

citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v.

City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134

F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion

of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete

facts establishing the existence of the truth of the matter asserted."). A court will affirm a grant of

summary judgment "if no reasonable jury would render a verdict for the opposing party if the record

at trial were identical to the record compiled in the summary judgment proceeding." *CSX Transp.,

Inc. v. Chicago & North Western Transp. Co., Inc.*, 62 F.3d 185, 188 (7th Cir. 1995).

14

When, as here, cross-motions for summary judgment are filed, the Court looks to the burden of proof that each party would bear on an issue of trial, and then requires that party to go beyond the pleadings and affirmatively establish a genuine issue of material fact. *Diaz v. Prudential Ins. Co. of Am.*, 2007 U.S. App. LEXIS 20067, *7-8 (7th Cir. 2007); *citing Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). For claims seeking benefits under an ERISA plan, at trial Skibbe would bear the burden of proving her entitlement to the benefits of the insurance coverage, and MetLife would bear the burden of establishing Skibbe's lack of entitlement. *Id.*

## II. The Standard of Review under ERISA

This Court's review of a motion for summary judgment on a claim for wrongful denial of benefits under ERISA involves several levels of analysis. First, the Court must determine whether MetLife's decision to deny benefits is subject to the de novo or arbitrary and capricious standard of review. *See Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 538 (7th Cir. 2000). Second, the Court must determine if there is a genuine issue of material fact as to whether the decision to deny benefits satisfies the applicable standard. *See Dade v. Sherwin-Williams Co.*, 128 F.3d 1135, 1144 (7th Cir. 1997).

The Court will review the Plan Administrator's denial of benefits de novo unless the benefit plan gives the plan administrator clear discretion to construe policy terms and the eligibility for benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000). If clear discretion has been granted, the decision to deny benefits is reviewed under an arbitrary and capricious standard. *See Firestone,* 489 U.S. at 115; *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005). A plan confers clear discretionary authority when it contains the following safe harbor language articulated in

15

*Herzberger*: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Herzberger*, 205 F.3d at 331. Yet, neither the safe harbor language nor other "magic words" are mandated so long as the plan language gives the employee adequate notice that the plan administrator "has the latitude to shape the application, interpretation, and the content of the rules in each case." *Diaz*, 424 F.3d at 637-39. Language that merely gives the employee notice that the plan administrator may make judgments within the confines of preset standards does not constitute a clear grant of discretion. *Id.* at 639.

The Plan conferred discretionary authority solely to "the Company." MetLife argues that another provision in the Plan *impliedly* delegates ADP's discretionary authority to MetLife, namely, the provision granting ADP the authority to "employ any person, persons or entity to furnish administrative services to the Plan and assist in the administration of the Plan." Skibbe does not challenge that the Plan confers discretionary authority to ADP, but contends that the Plan must *expressly* delegate ADP's discretionary authority to MetLife.

The Seventh Circuit declined to reach the question of whether the delegation of a plan administrator's discretionary authority need be express. *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 810-11 (7th Cir. 2006). Other circuit court decisions require explicit discretion-granting language in the plan in order to properly delegate discretionary authority. *Semien*, 436 F.3d at 810-11; *citing Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1388-89 (9th Cir. 1994) (benefit decision by an employee not explicitly given discretion is reviewed de novo); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir. 2001) (when a "decision is made by a body other than the one authorized by the procedures set forth in a benefits plan," the standard of review is de novo); *McKeehan v. CIGNA Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003) ("Insurers are

16

accustomed to de novo judicial review of their decisions, and therefore we do not infer discretionary authority when an employer or plan sponsor has funded its obligations under an ERISA plan by purchasing a standard-form group insurance policy. Rather, we require 'explicit discretion-granting language' in the policy or in other plan documents to trigger the ERISA deferential standard of review"). "The plan should clearly and unequivocally state that it grants discretionary authority to the administrator." *Perugini-Christen v. Homestead Mortg. Co.*, 287 F.3d 624, 626 (7th Cir. 2002). If a plan must "clearly and unequivocally" grant discretionary authority to the plan administrator, then it is logical that it must "clearly and unequivocally" delegate the plan administrator's discretionary authority to its fiduciaries or third parties and an implied delegation will not suffice. Based upon the long-standing requirement that de novo review is presumed unless plan administrators and their fiduciaries are "clearly and equivocally" granted discretionary authority, this Court will follow the holdings of other circuit courts requiring plan administrators to expressly delegate their discretionary authority to fiduciaries or third parties.

Here, the Plan conferred discretionary authority to the Company only. While the Plan authorized ADP to employ MetLife to furnish administrative services and assist in the administration of the Plan, such language does not suffice to clearly and unequivocally grant MetLife discretionary authority to make its decisions. *See Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F. 3d 1109, 1111-13 (9th Cir. 2001) (Where Plan stated MetLife "will make all decisions on claims" and that "the management and control of the operation and administration of claim procedures under the [p]lan, including the review and payment or denial of claims and the provision of full and fair review of claim denials....shall be vested in [MetLife], "such language did not suffice to unambiguously grant MetLife "discretionary authority in making those decisions."); *compare*

17

*Madden v. ITT long Term Disability Plan*, 914 F. 2d 1279, 1283-84 (9th Cir. 1990) (Plan expressly delegated third party discretionary authority to determine eligibility for benefits and to construe the terms of the plan calling for the "arbitrary and capricious" standard of review); *compare Yambert v. Whitman Corp.*, 1998 U.S. Dist. LEXIS 7155, *14-15 (N.D. Ill. 1998) (Plan clearly granted contract plan administrator, Aetna, authority to approve payment of LTD claims and Aetna transferred its responsibilities as contract plan administrator to its successor, CIGNA, delegating discretionary authority). Had ADP wished to afford MetLife, or any other person or entity, deference in making claims determinations, it should have expressly delegated its discretion within the provisions of the Plan or entered into a claims service agreement granting its fiduciaries or other entities discretionary authority. *See Semien*, 436 F.3d at 810-11; (Where the Plan conferred discretionary authority to the Company, BP, and the Administrative Service Agreement expressly delegated BP's discretionary authority to the new Plan Administrator, LINA, LINA's decision to deny benefits was entitled to deference.) The Plan clearly and unequivocally notifies employees that ADP retains discretion to deny their claims, but does not clearly and unequivocally notify employees that other entities, such as Prudential and MetLife, were delegated ADP's discretionary authority. Because ADP's discretionary authority was not expressly delegated to MetLife, MetLife's decision to terminate Skibbe's benefits will be subject to a de novo standard of review.

## III. MetLife's decision to terminate Skibbe's LTD benefits on the basis that she failed to produce proof of continued and uninterrupted disability was correct.

Because MetLife's decision is subject to de novo review, the question before this Court is not whether MetLife gave Skibbe a full and fair hearing or undertook a selective review of the evidence; rather, it is whether Skibbe was entitled to the benefits she sought under the plan. *Diaz*, 2007 U.S. App. LEXIS at * 9; *citing Wilczynski v. Kemper Nat. Ins. Companies*, 178 F.3d 933,

934-35 (7th Cir. 1999). Put another way, in applying the de novo standard of review, the appropriate question is whether MetLife was correct in deciding to terminate Skibbe's benefits. *Id.; citing Wilczynski*, 178 F.3d at 935.

Under the Plan, Skibbe was entitled to continue to receive LTD benefits so long as she submitted periodic proof of continued disability. MET 0477; Def.56.1(b) ¶ 3. The Plan uses two definitions for disability—one that applies to the first twenty-four months, and another for disabilities that continue beyond 24 months. Pl. Rep. 56.1 ¶ 43. For the first twenty-four months of disability, disability is defined as the person's "complete inability...." "...to perform any and every duty pertaining to his/her own occupation." Pl. Rep. 56.1 ¶ 43. As many plans do, the ADP Plan shifts its focus from the employee's own job to the employee's inability to "engage in any work or occupation for which s/he is reasonably fitted by education, training or experience" after the first twenty-four months have passed. *See Diaz*, 2007 U.S. App. LEXIS at \*7-9; *citing Santaella*, 123 F.3d at 461. MetLife's decision to terminate Skibbe's benefits occurred more than ten years after her initial claim for LTD benefits. Therefore, at trial Skibbe will bear the burden of proving that she is entitled to LTD benefits because she is unable to "engage in any work or occupation for which s/he is reasonably fitted by education, training or experience" and MetLife will bear the burden of establishing Skibbe's lack of entitlement. *Id.*

For many years, Skibbe produced periodic proof of continued disability to Prudential. In fact, the SSA approved Skibbe's application for disability benefits in 1994. However, the SSA's finding that Skibbe was totally disabled is probative, but not determinative as Skibbe suggests. *See Tegtmeir v. Midwest Operating Engrs. Pen. Trust Fund*, 390 F.3d 1040, 1046-47 (7th Cir. 2004); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 (7th Cir. 1992). The SSA determined that Skibbe

was disabled in 1994 based upon Skibbe's 1992 application and MetLife's decision to terminate Skibbe's benefits did not occur until 2003. As such, the SSA's determination of Skibbe's condition in 1994 bears little relevance to whether Skibbe continued to be totally disabled in 2003.

To be sure, ample evidence existed to support Skibbe's disability from 1992 to 1994 when she underwent multiple surgeries including wide decompressive laminectomy, posterolateral fusion, and several surgeries to remove scar tissue. However, a patient's condition can improve with time and Skibbe's medical records from 2002 to 2004 paint a different picture of her ability to engage in any work or occupation for which she is reasonably fitted by education, training or experience.[3] In April 2003, Skibbe was evaluated by a new treating physician, Dr. Scott Waters. Dr. Waters examined Skibbe and noted that she appeared to be in good health, exhibited full range of motion, normal rotation, stability, strength, and tone. Pl. 56.1 Rep. ¶ 23. Dr. Waters found that Skibbe exhibited only "some limitation" in standing, sitting, change of position, pushing, pulling, twisting, grasping, finger dexterity, bending, stooping, squatting, and repetitive movement. MET 0506. Although Dr. Waters felt that Skibbe had made "minimal progress" since her operation and diagnosed Skibbe with chronic back pain and neurogenic bladder, he ultimately concluded that Skibbe was no longer totally disabled and that she could return to a sedentary occupation. MET 0506. Similarly, Skibbe's physical therapist concluded that Skibbe "displayed the ability to function in the sedentary physical demand level for an 8-hour day" and Dr. Waters' later concurred with

---

[3] The limited footage obtained by the surveillance videos and photographs was ultimately inconclusive because it did not prove that Skibbe was able to perform any job related activities on a daily basis or continue them for an extended period of time. *See Oshun v. Auburn Foundry, Inc.*, 293 F.Supp.2d 863, 870 (N.D. Ind. 2003); *See also Mullally v. Boise Cascade Corp. Long Term Disability Plan*, 2005 U.S. Dist. LEXIS 387, 2005 WL 66070, *7 (N.D.Ill. 2005) (stating activities caught on tape only reveal that, for limited periods of time, a plaintiff was able to complete certain activities, but does not illustrate that she is able to work full time because it is easier for her to interrupt her activities when she is at home).

20

Skibbe's therapist's findings. MET 0491,0506-507.[4]

This Court acknowledges Skibbe's medical condition and symptoms and recognizes that the record contains at least some evidence that she experiences chronic pain. But, Skibbe's subjective complaints of pain were taken in account by her physicians and they concluded that her condition was no longer disabling and that she was capable of sedentary work. *See Olson v. Comfort Sys. USA Short Term Disability Plan*, 407 F. Supp. 2d 995, 1012 (W.D. Wis. 2005) (the evidence warranted granting summary judgment for defendant employer on issue of employee's disability, despite the fact that there was "little doubt that plaintiff ha[d] substantiated her diagnosis of fibromyalgia"). Indeed, it is particularly telling that Skibbe's treating physicians offered opinions that she could return to work in a sedentary position. *Leipzig v. AIG Life Ins. Co.*, 362 F. 3d 406, 409 (7th Cir. 2004) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers...must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk.)")

This is not a case where the insurer's physicians' opinions contradict those of the patient's treating physicians. On the contrary, Dr. Porter, the independent examiner, agreed with Dr. Waters' conclusion that Skibbe was no longer totally disabled. He also concurred that Skibbe was capable of performing sedentary work on a full-time basis and further opined that "[w]ith reconditioning

---

[4] Assuming Skibbe's claim for total disability benefits is based in whole or in part upon Dr. Waters' secondary diagnosis of hypertension and depression, Dr. Waters merely opined that those conditions "may" affect her ability to work. Moreover, Dr. Waters concluded that Skibbe's hypertension was "essentially benign" and Skibbe denied chest pain, shortness of breath, dyspnea on exertion, pedal edema or headaches. Skibbe's feelings of depression had also improved and she denied excessive crying, and feelings of persistent sadness, hopelessness, and fatigue during her June 2003 appointment. There was no evidence in the administrative record that a physician found that either condition rendered Skibbe totally disabled.

over six weeks, she would have the ability to perform at a medium work level." [5] Skibbe's physician's and therapist's opined that she was no longer totally disabled, and in fact, was capable of returning to work at a sedentary level—and their opinions were supported by independent examiners. Therefore, this Court finds that Skibbe is not disabled under the terms of the Plan and MetLife's decision to terminate Skibbe's LTD benefits was correct.

### MetLife presented sufficient evidence such that a reasonable jury could find that Skibbe's condition improved

Skibbe's argument that no physician found that her condition had improved runs contrary the medical evidence. As Drs. Anderson and Spencer expected, Skibbe's condition improved with time as evidenced by comparing Dr. Charmin's findings with those of Dr. Waters and Ms. Lundblad. In 1997, Skibbe could sit continuously for ten to fifteen minutes and stand or walk continuously for ten minutes  in an eight-hour work day.  Dr. Charmin concluded that with treatment and rehabilitation, Skibbe should be able to engage in some gainful occupation, with specific restrictions on lifting and walking. Six years later, Skibbe was able to sit for 40 minutes and stand for 20 minutes "frequently," meaning, 2.5 to 5.5 hours. Accordingly, MetLife presented sufficient evidence such that a reasonable jury could conclude that Skibbe's condition improved.

### MetLife's decision that Skibbe was capable of returning to her job as a Lead Multi-Function Operator was correct

---

[5] Skibbe's briefs and Complaint do not appear to argue that she is entitled to LTD benefits on the basis of a psychiatric disorder. Even if this Court were to assume that Skibbe sought benefits pursuant to Dr. Waters' diagnosis of depression, Dr. Waters noted that she was functioning well on Zoloft and that friends and family noticed improvement. No other physician commented on Skibbe's mental status and Dr. Waters did not find that Skibbe's depression rendered her disabled. Moreover, MetLife's independent physician, Dr. Kessler, found that Skibbe's records were inadequate to substantiate the presence of a psychiatric disorder, as consistent with DSM IV criteria. Pl. 56.1 Rep. ¶ 38. Based upon the absence of medical records indicative of disabling depression, MetLife was correct to deny Skibbe's claim for benefits on the basis of a psychiatric condition.

22

MetLife decided that Skibbe was able to return to her position as a Lead Multi-Function Operator. Yet, no physician was able to opine that Skibbe was capable of returning to her own job. However, this Court finds that MetLife's decision was correct and supported by the medical evidence. Ms. Lundblad found that Skibbe was capable of working in a sedentary capacity as defined by the Dictionary of Occupational Titles. MET 0491. The Dictionary of Occupational Titles defines sedentary work as:

> "Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time."

Dictionary of Occupational Titles (4th ed. 1995), http://www.oalj.dol.gov/ libdot.htm#definitions. Skibbe's employer described her job duties as requiring sitting 80% of the day, walking and standing the remaining 20%, and carrying no more than five pounds once per day. Def. 56.1(b)¶ 2. Accordingly, Skibbe's employer's description of her job duties fits squarely within the DOT definition of sedentary work. Therefore, MetLife produced sufficient medical evidence supportive of its decision that Skibbe was capable of returning to her own job and MetLife's decision was correct.[6]

## IV. Conclusion and Order

Under the Plan, the onus was on Skibbe to provide proof of continuing total disability and Skibbe's updated medical records belied her claim. MetLife, on the other hand, produced sufficient

---

[6] Even if this Court were to assume that Skibbe's position required travel and lifting exhibits, Skibbe was capable of traveling to Alaska and Jamaica in 1993 and Skibbe's medical records show that she was capable of "exerting up to 10 lbs. force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects..." MET 0491.

23

evidence that Skibbe was no longer totally disabled in 2003 and was capable of returning to work at a sedentary level. This Court finds that MetLife's decision to terminate Skibbe's LTD benefits was correct. For the foregoing reasons, Skibbe's Motion for Summary Judgment is denied and MetLife's Motion for Summary Judgment is granted. Skibbe's Complaint against Defendants is hereby dismissed with prejudice.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: 9-24-07

24